CONSOLIDATED CIGAR CORPORATION, a Delaware corporation; and Cuban Cigar Brands, N.V., a corporation of the Netherlands Antilles, Plaintiffs,

v.

MONTE CRISTI DE TABACOS, c.x.a., a corporation of the Dominican Republic; Julio Perez Gonzalez; WD Distributors, Inc., a proprietorship or other legal entity; Pamela Vargas, individually and doing business as WD Distributors Inc.; Francisco Fiorinelli; and Joseph Balaez, Jr., Defendants.

No. 96 Civ. 4209 (BSJ)(RJW).

United States District Court, S.D. New York.

July 19, 1999.

Grimes & Battersby, Stamford, CT (Leora Herrmann, of counsel), for Plaintiffs.

Julio Perez Gonzalez, Monte Cristi de Tabacos, Miami, FL, Defendants, pro se.

## OPINION

WARD, District Judge.

Plaintiffs Consolidated Cigar Corporation ("Consolidated") and Cuban Cigar Brands, N.V. ("CCB") move pursuant to Fed.R.Civ.P. 56 for summary judgment against defendants Monte Cristi de Tabacos, c.x.a. ("MCdT") and Julio Perez Gonzalez ("Perez") (collectively "MCdT Defendants") on plaintiffs' trademark counterfeiting, dilution, and infringement claims. The claims arise out of the MCdT Defendants' alleged sale of counterfeit Montecristo cigars ("MCdT cigars") to U.S. importers and distributors for distribution in the United States, and out of the MCdT Defendants' alleged use of infringing trade names "Montecristi," "Monte Cristi," "Monte Cristi de Tabacos, c.x.a." and "Monte Cristi, R.D." For the reasons stated below, the Court grants plaintiffs' motion for summary judgment on all claims.[1]

## BACKGROUND

This action seeks damages and injunctive relief under the Trademark Act of 1946, as amended (The Lanham Act, 15 U.S.C. § 1051 *et. seq.*), and under New

---

1. Although this action remains on the docket of Judge Jones, the instant motion is being decided by Judge Ward by agreement of both judges.

York General Business Law and common law.[2]

Plaintiffs filed their complaint on June 7, 1996, and obtained a permanent injunction against defendant WD Distributors on June 27, 1996. The instant motion was filed on August 4, 1998. Plaintiffs have not moved for summary judgment against defendants Francisco Fiorinelli or Joseph Baleaz, Jr., who have not been served, or defendant Pamela Vargas.

■ On January 29, 1998, the Court granted permission for the MCdT Defendants' counsel to withdraw. The Court granted the MCdT Defendants until March 6, 1998 to retain new counsel and directed that if new counsel had not appeared by that date, plaintiffs could proceed to litigate the case. By letter dated February 11, 1998, the MCdT Defendants informed the Court that for financial reasons they were unable to retain new counsel. On May 7, 1999, the Court ordered MCdT to appear by an attorney on or before June 7, 1999. No attorney has appeared for MCdT to date. Because corporations may not proceed without an attorney, *see Rowland v. California Men's Colony*, 506 U.S. 194, 201–02, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993), the Court directs the entry of a default against defendant MCdT.

## I. *Facts* [3]

### A. *Parties*

Consolidated, a Delaware corporation with its principal place of business in Florida, manufactures, distributes, and sells cigars under numerous well-known trademarks. Consolidated owns a majority interest in CCB, a corporation which has a Florida office and which is organized and existing under the laws of the Netherlands Antilles. CCB manufactures, distributes, and sells cigars in the United States and abroad, directly and/or through its licensees. In addition, CCB owns several famous premier cigar brands, including the flagship MONTECRISTO cigar. MONTECRISTO cigars are imported and distributed in the United States exclusively by Consolidated. At all times relevant to this litigation, MONTECRISTO cigars have been manufactured by a subsidiary of Consolidated in the Dominican Republic.

Perez, who maintains an office in the Dominican Republic, is an equity owner and managing director of MCdT, supervising and controlling MCdT's activities. MCdT, a cigar manufacturer, is a corporation organized and existing under the laws of the Dominican Republic, with an office located in that country. MCdT's cigar brands include counterfeit "Montecristo" cigars ("MCdT cigars"), some of which are packaged in trade dress virtually identical to CCB's MONTECRISTO trade dress, using counterfeit facsimiles of CCB's MONTECRISTO trademarks. In addition, MCdT uses the trade names "Montecristi," "Monte Cristi," "Monte Cristi de Tabacos, c.x.a.," and "Monte Cristi, R.D." ("Monte Cristi Trade Names").

---

**2.** Specifically, plaintiffs' claims are as follows: (1) trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) trademark infringement and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) trademark dilution under the Federal Trademark Dilution Act of 1995, 109 Stat. 985; (4) importation of merchandise simulating a registered trademark, arising under Section 42 of the Lanham Act, 15 U.S.C. § 1124; (5) trademark dilution under Section 368–d of the New York General Business Law; and (6) unfair competition and trademark infringement under New York State common law.

**3.** Because the MCdT Defendants failed to file a statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Rule 56.1 Statement"), *see* Section II(C) below, the facts are taken from plaintiffs' Rule 56.1 Statement and supporting documentation, and are deemed admitted under Rule 56.1(c) of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York.

The Monte Cristi Trade Names have been used in advertisements and media reports that have been published and distributed in the United States and on the internet. MCdT cigars were also listed in the 1998 edition of the Tobacco Retailers' Almanac, a widely distributed tobacco industry publication, as "Montecristi" brand cigars.[4]

## B. *Plaintiffs' Trademarks*

CCB owns U.S. Trademark Registrations for the trademark MONTECRISTO, the trademark MONTE CRISTO, and the Crossed–Sword Design. Since at least 1935, CCB, through its licensees and its predecessor-in-interest, has used these trademarks in commerce in and with the United States. The MONTECRISTO cigar brand is widely regarded as one of the premium cigars. CCB's MONTECRISTO mark is used on its packaging, in advertisements, and on the internet. The MONTECRISTO brand has also been advertised widely in a variety of national magazines.

CCB packages MONTECRISTO brand cigars in a trade dress which consists of a paper-covered plywood box, with the mark MONTE CRISTO and Crossed–Sword Design appearing in red, black, and gold against a yellow field ("MONTECRISTO Trade Dress"). Each box's side panel contains the mark MONTECRISTO in red and gold lettering, and the inside of the box's top cover bears the mark MONTEC-RISTO in red and gold lettering, with the mark MONTE CRISTO and Crossed–Sword Design appearing in red, black, and gold against a yellow field. A sheet of paper, visible when the box is open, rests on top of the cigars and contains the mark MONTECRISTO. Each individual MON-TECRISTO brand cigar is packaged with a cigar band on which appears the trade-

mark MONTECRISTO. Both the cigar band and the Crossed–Sword Design contain the notation "M & G," referring to CCB's predecessor-in-interest, Menendez Garcia y Compania Limitada ("Menendez Garcia"). As noted above, through its licensees and Menendez Garcia, plaintiff CCB has used the MONTECRISTO Trademarks since at least 1935 in connection with its sale of premium cigars in the United States.

## C. *MCdT Distributorship*

This action stems from the MCdT Defendants' efforts to distribute MCdT cigars in the United States. In 1995, Perez solicited his then-friend Fiorinelli to set up a distribution network in New York for various kinds of cigars, including MCdT cigars. Perez gave Fiorinelli (1) a presentation case labeled "Monte Cristi de Tabacos," containing sample MCdT cigars, for use in presentations to prospective customers in New York; (2) a suitcase full of packages and boxes of MCdT cigars in yellow boxes virtually identical to CCB's MONTECRISTO Trade Dress; and (3) MCdT's sales prices for these products.

When he arrived in New York, Fiorinelli obtained the assistance of his niece, Vargas, in establishing a distribution network in New York for MCdT. During the summer and fall of 1995, Fiorinelli, and eventually Vargas, contacted potential customers in New York and New Jersey, offering to sell them MCdT cigars. After a brief hiatus in these activities, MCdT sent Vargas a new set of price lists for MCdT cigars in March of 1996. Later that month, Perez gave Fiorinelli a written description of the various MCdT cigar brands, with instructions that he fax these descriptions to Vargas for her to use in her New York sales efforts. Upon receipt of

---

4. Defendant WD Distributors, Inc. ("WD Distributors") is a proprietorship operated in the Southern District of New York in 1995 and 1996. WD Distributors and plaintiffs entered into a Stipulation for Entry of Judgment on June 14, 1996, pursuant to which a Judgment was entered against WD Distributors on June 27, 1996. Defendant Pamela Vargas ("Vargas") was the proprietor of WD Distributors. Defendants Francisco Fiorinelli ("Fiorinelli") and Joseph Balaez, Jr. have not filed appearances in this action.

the price lists, Vargas wrote a form solicitation letter to send to tobacco retailers.

On or around March 11, 1996, Vargas sent a package from the Bronx, New York to Arnold's Tobacco Shop in New York, New York containing an offer from WD Distributors to supply Arnold's with MCdT cigars. The package contained (1) a box of MCdT cigars which Fiorinelli had received from Perez and brought to New York; (2) a cellophane wrapped package of MCdT cigars which Fiorinelli had received from Perez; and (3) a box of cigars with the trade name "Monte Cristi de Tabacos, c.x.a." printed on it.

In or around March of 1996, Vargas also sent packages to two additional tobacco retailers, one located in New York and the other located in New Jersey. These packages included, among other things, a letter soliciting orders for MCdT's cigars, sample MCdT cigars from the supply that Perez had provided Fiorinelli, and a price list and order form for MCdT cigars.

Shortly after the above events, Vargas traveled to the Dominican Republic. While there, she learned that CCB was trying to serve her in connection with a trademark infringement lawsuit based on her distribution of MCdT cigars. When she informed Perez of this pending lawsuit, he encouraged her to continue distributing MCdT cigars in the United States, and told her that CCB had no basis for asserting that she could not distribute them.

In addition to the above activities, the MCdT Defendants made other deliberate efforts to distribute MCdT cigars in the United States. One such effort involved the sale of MCdT cigars to Rocco Zagarella ("Zagarella") of Boston, Massachusetts, for his company Waterfront Beer & Wine ("Waterfront"). In January, 1996, Perez personally accepted Zagarella's order by telephone for a total of thirty boxes of MCdT cigars, which MCdT shipped directly to the United States from the Dominican Republic. In early February of 1996, one of the MCdT Defendants' shipments to Waterfront was detained by U.S. Customs. MCdT managers assured Zagarella that MCdT was the legitimate owner of the MONTECRISTO brand, and that "many people" were importing MCdT cigars into the United States. MCdT also attempted to assist Zagarella to convince Customs to allow him to import the MCdT cigars, giving Zagarella a letter stating that "the name of Montecristo derives from the name of the factory of cigars Monte Cristi de Tabacos, C.X.A. in the Dominican Republic ..."

After the February, 1996 detention of MCdT's shipment to Waterfront, Zagarella visited MCdT in the Dominican Republic, and showed MCdT's representatives the U.S. Customs Notice of Detention stating that the detention was based on possible infringement of the MONTECRISTO trademark. MCdT's representatives expressed bewilderment as to why the MCdT cigars had been detained. After this, MCdT sent two additional shipments containing at least seventy boxes of MCdT cigars to Waterfront. Some of these boxes were virtually identical to CCB's MONTECRISTO Trade Dress; others were packaged in wood boxes marked with MONTE CRISTO, MONTECRISTO and the Crossed–Sword Design trademark. All of the boxes were marked, "Monte Cristi de Tabacos."

Another MCdT effort to distribute MCdT cigars in the United States consisted of MCdT's representations to importer James Orth ("Orth") who was in the business of sourcing various products in the Caribbean for the Texas-based Stanford Trading Company ("Stanford Trading") to purchase and distribute. When Orth and Perez first met in December, 1995, Perez told Orth that he was the owner of MCdT. In those and subsequent conversations, Perez and other MCdT agents falsely represented to Orth that MCdT was manufacturing its cigars under contract with Consolidated. When Orth expressed concern about a minor difference in the MCdT

cigar band and plaintiffs' MONTECRISTO cigar band, Perez reassured him that the difference existed because the MCdT cigars were manufactured under contract with Consolidated for export and for sale in duty free markets. Perez told Orth that MCdT had the right to sell MCdT cigars in the United States and that it had been doing so for a significant time period. Perez also told Orth that MCdT could provide Stanford Trading with two thousand boxes of cigars per month. Based on these representations by the MCdT Defendants, Stanford Trading and its agents in the United States offered MCdT cigars to over 200 cigar stores in the United States, ultimately delivering over $67,000 worth of MCdT cigars to a Pennsylvania retailer.

In addition to the above-detailed distribution efforts, the MCdT Defendants supplied MCdT cigars to importers in Washington State; Mount Sinai, New York; and Queens, New York, among other locations within the United States. In one case, the MCdT Defendants provided Queens-based cigar distributor Victor Gaier with a letter to give to U.S. Customs, which had seized MCdT cigars he had ordered.

## II. *Summary Judgment Standard*

### A. *General Standard*

A party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Furthermore, the Federal Rules of Civil Procedure "mandat[e] the entry of summary judgment, after adequate discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The

party moving for summary judgment bears the burden of production, or "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex* 477 U.S. at 323, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts...." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted). Rather, the opposing party must produce "concrete evidence from which a reasonable juror could return a verdict in [its] favor...." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Under Rule 56(e) of the Federal Rules of Civil Procedure, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading ..." and therefore, "mere conclusory allegations or denials ... are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995) (internal quotations and citations omitted). "[T]he mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party ... [; the nonmovant] ... must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (citations omitted).

### B. Summary Judgment Standard for a Trademark Case

■ Summary judgment is appropriate in a trademark case where the facts upon which an infringement or dilution analysis will rest are clearly beyond dispute. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 876 (2d Cir.1986). In the present case, the Court applies the analysis articulated in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.1961), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). "[T]he application of ... facts to the *Polaroid* test and likelihood of confusion analysis ... is a legal issue which [is] appropriate for the district court to resolve on summary judgment." *Lois Sportswear,* 799 F.2d at 876. Thus, the present case is ripe for summary judgment.

### C. The MCdT Defendants' Response to the Instant Motion

The MCdT Defendants have filed only the sparsest response to plaintiffs' motion: a two-page sworn statement dated August 28, 1998 ("MCdT Defendants' Statement"), which does not conform to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York ("Local Rule 56.1"). The MCdT Defendants submitted no other affidavits, documents, or exhibits along with the MCdT Defendants' Statement. Summary judgment may be granted against the MCdT Defendants despite their failure to file a more thorough response, because the MCdT Defendants were given notice of the consequences of failing to respond to the motion.[5]

■ An easily comprehensible notice from the party moving for summary judgment is sufficient to provide notice to a pro se litigant that failure to respond to a summary judgment motion will be deemed a default. *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *M.B. v. R.M. Reish,* 119 F.3d 230, 232 (2d Cir.1997); *Sanchez v. National Cleaning Company,* 11 F.Supp.2d 453, 454 (S.D.N.Y.1998). The language of the July 29 Letter is nearly identical to that approved by the Second Circuit in *Champion,* and therefore provided the MCdT Defendants with adequate notice.

The MCdT Defendants' Statement contains only conclusory denials and presents no evidence to contest plaintiffs' claims.[6]

---

5. On July 29, 1998, plaintiffs sent a letter ("July 29 Letter") to the MCdT Defendants stating,

> PLEASE NOTE that, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, you may not simply rely upon your complaint. You must respond by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in plaintiffs' declarations and affidavits will be accepted as being true unless you submit affidavits, declarations or other documentary evidence contradicting plaintiffs' assertions.
>
> IF YOU DO NOT SO RESPOND, summary judgment, if appropriate, may be entered against you and in favor of plaintiffs without a trial, which may include an injunction, a monetary award and an award to plaintiffs of their litigation costs and attorney's fees.
>
> PLEASE ALSO NOTE that Local Civil Rule 56.1 of the United States District

Courts for the Southern District of New York requires you to include a separate, short and concise statement of any material facts as to which you contend there exists a genuine issue. In the absence of such a statement, all material facts set forth in plaintiffs' Rule 56.1 statement will be deemed admitted.

6. The relevant sections of the MCdT Defendants' Statement state that the MCdT Defendants (1) own the MONTECRISTO trademark in the Dominican Republic; (2) established a factory there to make MONTECRISTO cigars; (3) have never "undertaken the export nor authorized that [their] products be exported under the customs and health laws of the Dominican Republic;" (4) never obtained an agent to represent them in the United States; (5) only sold MONTECRISTO cigars in legal places in the Dominican Republic and are therefore not responsible for the acts of third parties who may try to sell them elsewhere; (6) never "exported or attempted to carry out any activity of promotion and sale of ... cigars in the United States, ... much less ...

Therefore, the Court treats plaintiffs' motion as unopposed.

## III. Jurisdiction

### A. Personal Jurisdiction

■ To determine personal jurisdiction over a non-domiciliary in a case involving a federal question, the Court applies the forum state's long-arm statute. *Hubbell Incorporated v. Pass & Seymour, Inc. and Legrand, S.A.,* 883 F.Supp. 955, 961 (S.D.N.Y.1995). New York's long-arm statute provides:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state. . . .

N.Y. C.P.L.R. § 302(a) (McKinney 1990) ("Section 302(a)"). Since MCdT is a non-domiciliary and distributed cigars in New York State, it is subject to this Court's jurisdiction. Section 302(a) also confers jurisdiction over individual corporate officers who supervise and control an infringing activity. *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.,* 829 F.Supp. 62, 66 (S.D.N.Y.1993). Therefore, this Court has personal jurisdiction over not only MCdT, but also over Perez as its corporate officer.

### B. Subject Matter Jurisdiction

■ "[F]oreign manufacturers who sell their product in the United States through importers, but with full knowledge and intention that they will be resold to consumers in this country, are subject to the Lanham Act." *Alto Products Co. v. Ratek Industries. Ltd.,* No. 95 Civ. 3314, 1996 WL 497027, at *3 (S.D.N.Y. September 3, 1996) (internal quotations and citations omitted). In addition, a corporate officer with a financial interest in the corporation and the ability to control or supervise an infringing activity has personal liability for trademark infringement. *Editorial* at 66. Because MCdT purposefully sold MCdT cigars to importers knowing that they would be resold in the United States, and because Perez knowingly participated in and supervised those transactions, both MCdT Defendants are subject to United States law.

## IV. Plaintiff's Claims

### A. Unlawful Counterfeiting and Infringement of Plaintiff CCB's MONTECRISTO Trade Dress

#### 1. Trade Dress Counterfeiting

■ The Lanham Act defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." The mark used on the MCdT cigars and in MCdT cigar packaging is substantially indistinguishable from CCB's validly registered MONTECRISTO trademarks. MCdT cigar bands and boxes are nearly identical to plaintiffs' cigar bands and boxes, with only minor differences which would not be apparent to an unwary observer and which are legally insignificant.[7] *See Pepe, Ltd. v. Ocean View Factory Outlet Corp.,* 770 F.Supp. 754, 758 (D.P.R.1991). Therefore, the Court grants summary judgment in favor of Plaintiffs for trade dress counterfeiting.

#### 2. Trade Dress Infringement

■ A product's trade dress is its "total image includ[ing] features such as

---

established any distribution or agency network in the United States;" and (7) are not counterfeiters.

**7.** The only observable difference between plaintiffs' and defendants' cigar bands is that the MCdT cigar band displays the word "Ha-

bano" at the bottom of the band, instead of "M & G" as the genuine MONTECRISTO cigar bands do. Defendants' cigar boxes use the designation "Rep. Dom." instead of "M & G" as plaintiffs' do; their cigar boxes also contain very slight variations in color.

size, shape, color or color combinations, texture, [or] graphics." *Fabrication Enterprises, Inc., v. Hygenic Corporation,* 64 F.3d 53, 57 (2d Cir.1995) (quotations omitted). To prevail in an action for infringement of trade dress under Lanham Act Section 43(a), 15 U.S.C. 1125(a), ("Section 43(a)") plaintiffs must prove that their trade dress is distinctive and that there is a likelihood of confusion between their product and that of defendants. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Eligibility for protection under Section 43(a) also depends upon a showing of nonfunctionality. *Id.*

 CCB's MONTECRISTO Trade Dress is inherently distinctive. *See Paddington Corp. v. Attiki Importers & Distribs., Inc.,* 996 F.2d 577, 583–584 (2d Cir. 1993) (discussing distinctiveness analysis). The record contains no evidence of any industry practice of using a Crossed–Sword Design like the one on CCB's MONTECRISTO packaging. The packaging contains nothing descriptive which would convey information about its particular contents. "The tone and layout of the colors, the style and size of the lettering, and, most important, the overall appearance of the [packaging's] ... labeling, are undeniably arbitrary ... they were selected from an almost limitless supply of patterns, colors and designs." *Id.* Further, there is a likelihood of confusion between the packaging adopted by the MCdT Defendants and CCB's genuine MONTECRISTO packaging. As noted in Section IV(A)(1), above, the counterfeit and genuine cigar boxes are almost identical. Additionally, cigar importer Orth testified that he mistook the MCdT cigars for genuine MONTECRISTO cigars. Finally, MONTECRISTO's Crossed–Sword Design trade dress does not relate to the function of the product (i.e.cigars). Therefore, the Court grants summary judgment in favor of plaintiffs against the MCdT Defendants for trade dress infringement.

**B. *Infringement of Plaintiff CCB's MONTECRISTO Trademark by the "Monte Cristi" Trade Names***

 To succeed in their trademark infringement case under the Lanham Act, plaintiffs must show that the MCdT Defendants used their trademark in a manner likely to confuse consumers as to the source of the product. *See Lois Sportswear* 799 F.2d at 870. In *Polaroid,* the Second Circuit established the following nonexclusive list of factors for assessing the likelihood of confusion: the strength of the prior owner's mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the senior user will "bridge the gap" between the two products, actual confusion, the junior user's intent, the quality of defendant's product, and the sophistication of the buyers. *Polaroid,* 287 F.2d at 495. Evaluation of the *Polaroid* factors should not be mechanical, and no single factor is determinative. *See Plus Products v. Plus Discount Foods, Inc.* 722 F.2d 999, 1004 (2d Cir. 1983). The ultimate inquiry is whether consumers are likely to be confused. *See Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577, 584 (2d Cir.1993). Based on the following analysis, the Court finds a strong likelihood of confusion.

**1. *Strength of the Mark***

Trademarks are often classified in categories of generally increasing distinctiveness: generic, descriptive, suggestive, and arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). "A generic mark is generally a common description of goods," *W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993), while "[a] descriptive mark describes a product's features, qualities or ingredients in ordinary language." *Id.* at 572. Suggestive marks employ terms which do not describe but instead suggest the product's features, compelling the purchaser to use imagination and thought in reaching a conclusion

concerning the nature of goods. *Id.* "[T]he term 'fanciful', as a classifying concept, is usually applied to words invented solely for their use as trademarks. When the same legal consequences attach to a common word, i.e., when it is applied in an unfamiliar way, the use is called 'arbitrary.'" *Abercrombie,* 537 F.2d at 11 n. 12. Arbitrary, fanciful, or suggestive marks are considered "inherently distinctive," and are therefore automatically entitled to Lanham Act protection. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

In the present case, the MONTECRISTO trademark is an arbitrary mark, and therefore among the strongest and most highly protected class of trademarks. *Abercrombie* 537 F.2d at 9. In addition, MONTECRISTO's commercial success, as shown by widespread media exposure and advertising expenditures, reinforces the strength of the mark. *See Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.,* 832 F.2d 1317, 1321 (2d Cir. 1987) (considering extensive advertising a factor in finding a strong mark). Therefore, the "strength of the mark" factor weighs in plaintiffs' favor.

#### 2. *Degree of Similarity Between the Marks*

The MCdT Defendants' trade names "Montecristi" and "Monte Cristi" and CCB's trademark "Montecristo" and "Monte Cristo" are very similar, weighing heavily in favor of a likelihood of confusion. The designations are almost identical, both phonetically and visually. *See G.D. Searle & Co. v. Chas. Pfizer & Co.,* 265 F.2d 385 (7th Cir.1959), *cert. denied,* 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959); *Generation X International Corp. v. No Excuses Sportswear, Ltd.,* No. 98 Civ.1935, 1998 WL 249177, at *20–21 (S.D.N.Y.). Although the final letter of the MCdT Defendants' product is "i" instead of "o," "consumers would be 'reasonably justified in believing both products come from the

same [Source].'" *Nabisco Brands, Inc. v. Arnold Kaye and Arnie's Deli, Ltd.* 760 F.Supp. 25, 27 (D.Conn.1991), *quoting Harlequin Enterprises v. Gulf & Western Corp.,* 644 F.2d 946, 949 (2d Cir.1981). In the present case, the only difference between the two names is the final letter, a scenario analogous to that in *Nabisco,* in which the only difference in the product names was the final digit ("A–1" versus "A–2" meat sauce). In that case, the court found that such a slight distinction "rather than differentiate the product, in fact, increases the likelihood that consumers will believe that the defendant's product is simply a variation on the basic 'A.1.' sauce or a line extension which emanates from, or is authorized by or otherwise affiliated with the same source as the 'A.1.' product." *Nabisco,* 760 F.Supp. at 27. Similarly, the proximity in sound and spelling of "Montecristi" to "Montecristo" is likely to lead consumers to believe, as importer Orth did, that defendants' MCdT cigars are affiliated with plaintiffs' products.

#### 3. *Proximity of Products*

The goods involved (cigars) are identical. Therefore, this factor weighs in plaintiffs' favor.

#### 4. *Likelihood that Senior User Will "Bridge the Gap"*

Where, as here, the parties are selling identical products, there is no gap to bridge; thus, this factor strongly favors plaintiffs. *Gucci Am., Inc. v. Action Activewear, Inc.,* 759 F.Supp. 1060, 1065 (S.D.N.Y.1991).

#### 5. *Evidence of Actual Confusion*

The law does not require plaintiffs to show evidence of actual consumer confusion. *See Nabisco* 760 F.Supp. at 28. However, when such evidence does exist, it is a strong indication of the likelihood of confusion. *Giorgio Beverly Hills, Inc. v. Revlon Consumer Products Corporation,* 869 F.Supp. 176, 184 (S.D.N.Y.1994). In the present case, plaintiffs have provided

evidence of actual confusion, in importer Orth's testimony stating that the similarity of the "Monte Cristi" and "Montecristo" names gave him a' comfort and confidence level that the MCdT cigars he was buying were in fact a genuine Montecristo product. Thus, this factor weighs in plaintiffs' favor.

### 6. *Junior User's Intent*

Evidence that a defendant deliberately engaged in a deceptive commercial practice, creates a presumption of consumer confusion. *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 140 (2d Cir.1991). The MCdT Defendants (a) told Orth that they had a contract with plaintiffs; (b) gave importer Zagarella a letter stating that "the name of Montecristo derives from the name of the factory of cigars Monte Cristi de Tabacos," Pls.' Rule 56.1 Statement, ¶ 38(d); and (c) used the similarity between the words "Montecristo" and "Montecristi" to convince a Washington State importer that the products stemmed from the same source. These actions demonstrate that the MCdT Defendants deliberately engaged in a deceptive commercial practice, thus creating a presumption of consumer confusion.

### 7. *Product Quality*

Where the junior user's product is inferior, the quality factor weighs in favor of the plaintiff. *Nikon v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir.1993). In the present case, the only evidence plaintiffs .offer to show the MCdT cigars' inferiority is included in a declaration by Richard L. Di-Meola, an officer with plaintiff Consolidated for over thirteen years, stating that the MCdT cigars "are of mediocre to poor quality and are grossly inferior to CCB's high quality MONTECRISTO cigars." Declaration of Richard L. Dimeola, dated June 29, 1998, ¶ 27. As the moving party in this summary judgment motion, plaintiffs bear the burden of production; as plaintiffs, they also have the burden of persuasion at trial. In light of these burdens, plaintiffs' evidence of the MCdT ci-

gars' inferior quality is scant; however, this paucity of evidence is inconsequential, given the strength of the other *Polaroid* factors.

### 8. *Sophistication of the Buyers*

When a product's average consumer is more sophisticated, trademark similarities are less likely to lead to confusion about the product's source or sponsorship. *Bristol–Myers Squibb Co. v. McNeil–P.P.C. Inc.*, 973 F.2d 1033, 1046 (2d. Cir.1992). Conversely, less sophisticated consumers are more likely to be confused by similarities among products. Cigars have grown in popularity in recent years, attracting new consumers who lack the sophistication required to distinguish among confusingly similar names, thus increasing the likelihood of confusion. Therefore, this factor weighs in plaintiffs' favor.

For the above reasons, the Court finds a strong likelihood of confusion between plaintiffs' products and the MCdT cigars.

### C. *Dilution of the MONTECRISTO Trademark*

Plaintiffs claim that the MCdT Defendants' use of counterfeits of CCB's MONTECRISTO trademark and their use of Monte Cristi Trade Names dilutes CCB's MONTECRISTO trademark in violation of Lanham Act Section 43(c)(1), 15 U.S.C. § 1125(c)(1), ("Section 43(c)(1)") and New York's anti-dilution statute. Section 43(c)(1) entitles the owner of a famous mark, subject to a reasonableness review, to "an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection." New York's anti-dilution statute states,

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of

**200**

competition between the parties or the absence of confusion as to the source of the goods or services.

N.Y. Gen. Bus. Law § 368–d (repealed 1996, eff. Jan 1, 1997, current version at N.Y. Gen. Bus. Law § 360–*l* (1997)).

█ In order to establish a dilution claim, plaintiffs must show (1) ownership of a distinctive or famous mark, and (2) a likelihood of dilution. *See Hormel Foods Corporation, v. Jim Henson Productions, Inc.*, 73 F.3d 497, 506 (2d Cir.1996) (quoting *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983)).

1. *Ownership of Distinctive or Famous Mark*

█ In considering Section 43(c)(1)'s list of nonexclusive factors for determining adequacy of a mark's fame or distinctiveness, the courts in this District have ruled that a mark found to be "strong" under the likelihood of confusion analysis is sufficiently famous or distinctive to receive protection from dilution. *See Lexington Management Corp. v. Lexington Capital Partners*, 10 F.Supp.2d 271, 289 (S.D.N.Y. 1998) (finding plaintiff's mark distinctive under Section 43(c)(1) based on finding of strength in infringement analysis); *Generation X* at 27 (same). Thus, based on the finding of strength in the likelihood of confusion analysis in Section IV(B)(1), the Court finds that CCB's MONTECRISTO trademark qualifies as famous for the purposes of the dilution statute.

2. *Likelihood of Dilution*

Under both the Lanham Act and New York state law, trademark dilution can occur through blurring or tarnishment. *See Hormel Foods*, 73 F.3d at 506. Tarnishment occurs when a trademark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context." *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir.1994). The doctrine does not apply in the present case, where there is no allegation of unwholesomeness or unsavoriness, and only scant evidence of the MCdT cigars' inferi-

ority, *see* Section IV(B)(7), above. Dilution by blurring occurs when customers or prospective customers observe the plaintiff's mark used on numerous and varied goods and services. *Id.* When this happens, "the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Id.* (emphasis deleted) (quoting *Deere & Co. v. MTD Products., Inc.*, 41 F.3d 39, 43 (2d Cir.1994)).

█ The blurring analysis contains five factors: (1) similarity of the marks; (2) similarity of the products; (3) consumers' sophistication; (4) the senior mark's renown; and (5) the junior mark's renown. *Lexington* 10 F.Supp.2d at 289. The first four factors are nearly identical to those in the *Polaroid* test, which in this case weigh heavily toward a finding of blurring. The final factor, the junior mark's renown, is significant because obscure use of a designation will likely have only a *de minimus* effect on a famous mark. In the present case, the MCdT Defendants' use of the designation "Montecristo" and of the Monte Cristi trade names is not obscure, because the MCdT Defendants have placed their product in the public eye through news articles, advertisements, and trade listings. Furthermore, numerous importers, distributors, and retailers have trafficked in MCdT cigars. Therefore, the MCdT Defendants' use of the designation "Montecristo" and of the Monte Cristi Trade Names has caused dilution by the blurring of CCB's trademark. Accordingly, summary judgment is granted to plaintiffs on their dilution claim.

CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motion for summary judgment on all claims.

Settle judgment on notice.